**ROBERG v. HOUSTON & TEX. C. R. CO.**
**(No. 7763.)**

(Court of Civil Appeals of Texas. Galveston.
Feb. 26, 1920. On Motion for Rehearing,
April 27, 1920. On Second Motion for Re-
hearing, May 13, 1920.)

**1. Master and servant ⬤☞103(2) — Railroad
held not liable under federal act for death of
foreman selecting weak chain.**

A railroad furnishing a wrecking crew with
chains of various and ample strength is not lia-
ble under federal Employers' Liability Act (U.
S. Comp. St. §§ 8657–8665) for the death of an
experienced foreman from breaking of a chain
of insufficient strength which he selected.

**2. Master and servant ⬤☞128—Injuries from
unusual use of appliances not actionable.**

A master is not liable for injury where
servant makes an unusual or unnecessary use
of tools and appliances which the master could
not have reasonably foreseen.

**3. Master and servant ⬤☞103(2) — Injuries
from employé's selection of appliance not ac-
tionable.**

A master is not liable for injuries to a serv-
ant from a selection from an adequate stock
of suitable appliances of an appliance which
was unsuitable for the purpose for which he
intended to use it if such unsuitableness was
a result of a defect which could not have been
detected and provided against on the part of
the master or of its being too light for the
use for which it was intended.

**4. Master and servant ⬤☞129(1)—Failure to
inspect chain of insufficient strength selected
held not proximate cause of injury.**

Where a railroad furnished a wrecking crew
with chains of ample strength to be used for
various purposes, its failure to inspect a chain
of insufficient strength selected by the foreman,
the breaking of which caused his death, was not
the proximate cause of his injury.

*On Motion for Rehearing.*

**5. Master and servant ⬤☞264(10)—No recov-
ery for negligence not pleaded.**

In action for death of employé under Em-
ployers' Liability Act (U. S. Comp. St. §§ 8657–
8665), plaintiffs could not recover on ground of
negligence not pleaded.

Error from District Court, Harris Coun-
ty; K. C. Barkley, Special Judge.

Suit by Mrs. Mary Roberg, administratrix,
against the Houston & Texas Central Rail-
road Company. Judgment for defendant,
and plaintiff brings error. Affirmed.

Baker, Botts, Parker & Garwood and Mc-
Means, Garrison & Pollards, all of Houston,
for plaintiff in error.

Kenneth Krahl, Hutcheson, Bryan & Dyess,
Kennerly, Williams, Lee & Hill, and Geo. A.
Hill, Jr., all of Houston, for defendant in
error.

⬤☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

PLEASANTS, C. J. This is a suit by
plaintiff in error, as administratrix of the
estate of her deceased husband, Andrew Ro-
berg, to recover damages for herself and
minor children resulting from the death of
her said husband, which she alleges was
caused by the negligence of the defendant in
error.

The petition alleges that the death of An-
drew Roberg was caused by the breaking of
a chain which was being used by the said
Roberg, an employé of defendant, in removing
a wrecked car from defendant's railroad
track. The charges of negligence contained
in the petition are as follows:

"(1) The chain used in lifting said car was
known to the defendant, or by the use of ordi-
nary care and diligence could have been known
to the defendant, to be of insufficient strength
for use as a hoisting chain for which purpose
it was furnished; such fact being unknown
to the deceased, and could not have been
known to the deceased by the use of ordinary
care, for the reason that the defendant did not
furnish the means with which to make a rea-
sonable test or inspection thereof.

"(2) Said chain was defective and out of
repair and unsuitable for such work, which fact
was known to the defendant, or could have been
known by the use of ordinary care, and which
fact could not have been ascertained by de-
ceased by the use of ordinary care, for the rea-
son that the means of making a reasonable test
or inspection were not furnished.

"(3) The assistant superintendent of the de-
fendant required the work being done at the
time of the accident to be performed in haste
while the car being hoisted was loaded, with-
out giving decedent reasonable time and means
to know and determine what was the best and
safest way in which to perform such work.

"(4) Defendant failed to inspect said chain
and failed to use ordinary care in the inspec-
tion thereof when the use of ordinary care in
the inspection thereof with proper appliances
would have revealed that said chain was de-
fective and insufficient.

"(5) The chain furnished by defendant for
hoisting purposes was old and worn and in-
sufficient.

"(6) Defendant failed to furnish reasonable
means or facilities for the inspection and test-
ing of its hoisting chain, the hoisting chain
being in itself a dangerous instrumentality."

Defendant answered by general demurrer
and general denial, and especially pleaded
that the deceased and the defendant, at the
time of the injury, were engaged in interstate
commerce, and that the liability of the de-
fendant to the plaintiff was therefore to be
determined under the act of Congress known
as the federal Employers' Liability Act (U.
S. Comp. St. §§ 8657–8665), and in that con-
nection the defendant alleged that the de-
ceased was familiar with the character and
kind of work he was then doing, and famil-
iar with the many methods and appliances
for raising cars; that, if the chain by which

the car was raised was in any way defective, such defectiveness could not be discovered by a reasonable inspection, all of which was known to the deceased at the time he went under the car or placed himself in such a position as to be caught and injured in the event the chain should break or the car should otherwise be caused to fall, notwithstanding all of which the deceased, after the car had been raised by means of the chain, negligently went under the same and negligently placed himself in a position where he would be caught and crushed by the car, if it should fall, and in so doing he assumed the risk.

Upon the trial in the court below the trial judge, after hearing the evidence, instructed the jury to return a verdict in favor of the defendant, and upon the return of such verdict judgment was accordingly rendered.

All of the material facts affecting the question of defendant's liability are shown by uncontradicted testimony.

The deceased husband of plaintiff, Andrew Roberg, was killed on January 1, 1914, while engaged as the foreman of a wrecking crew of defendant company in removing a wrecked car from defendant's railroad track at or near the town of Millican, Tex. In order to remove the car it was necessary to raise it several feet from the ground and place it upon trucks. This was done by means of a derrick and crane on and attached to a wrecking car and operated by an engine on the car. The wrecked car, which was made of steel, was loaded with cinders and brick and weighed from 110,000 to 120,000 pounds. One end of the car had been raised and placed upon the trucks and the other end was being raised by the crew under direction of Roberg, when the chain by which the car was attached to the crane broke, the car fell, and a rod attached thereto struck Roberg with such force as to cause his death in a few minutes.

The chain which was being used, and the breaking of which caused the accident, was one of the chains provided by appellant for the use of its wrecking crew and kept on the wrecking car. Chains of different sizes and strength are kept on the wrecking car, the larger and stronger chains for lifting the heavier loads and the smaller chains for the light loads. There were a number of chains, and one or two were cables kept on this wrecking car to be used in lifting loads with the derrick and crane which were larger and stronger than the one that was used. The chain that was used was a seven-eighths inch chain about 12 feet in length with a hook in the center. It was wrapped twice around the drawhead of the wrecked car, thus making it a double chain. There is no testimony as to the length of time the chain had been in use, but it appeared to be in good condition. Roberg, who was an experienced and efficient railroad man, was the wrecking foreman, and it was his duty to instruct the men under him how to handle the chains, tools, and wrecker, and to see that the wrecker was properly stocked with chains, tools, and appliances. Moore, who was the engineer on the wrecking car at the time of the accident, testified in regard to the use of the cables and chains with which the wrecker was supplied:

"I would trust an inch cable like they are generally used, taking single inch cable—that is, not double it or anything like that—with 25 tons. I would trust a 2-inch cable with as much as that wrecker could lift—that is 100 tons. As to 2½-inch cable, of course it goes on up; you can judge for yourself. * * *

"We use these cables on our cranes; some have a hook and some have an eye—what you call an eye-splice. The way these wrecker chains are used depends on what you are lifting and what the capacity of the car and load is; we have to use judgment; that is where your judgment comes in. From my knowledge and experience, these wrecker chains are used for switch chains, to chain body bolsters, truck bolsters, chain up a drawhead, chain up a sand bolster to the body bolster, if it will carry it, and to switch with it, and for chaining up trucks to a car, or anything that you want to lift, you know. If I wanted to lift a car, as to whether I would put around that car one of these grabhook railway wrecker chains depends on what it was loaded with and the capacity of it. They are not furnished for these heavy loads; I will tell anybody that; they are not furnished for these heavy loads.

"I was on this crane operating the engine. I don't know what that chain was bound around; it might have been around the deadwood, and it might have been around the coupler. It would not lift the load because the load was shifted. It lifted that end of the car all right and a part of the load, of which there was a slight load on this end, you know, the first end. I understand it is the first end you are talking about. The first end was slightly loaded, because this car had been in the wreck, and in this bump had shifted its load, brick and cinders, or whatever there was in it—brick and cinders I call it—had shifted to this other end."

"If I was wrecking, I would not lift the other end of the load with a seven-eighths inch chain wrapped around it twice; I would not do it; I would be afraid to do it, is the reason; I would want to avoid all accidents I could; that is my practice; I would have been afraid to do it. * * * I didn't tell Mr. Roberg, when I was 18 feet away, that that seven-eighths inch chain wrapped around that car was not a sufficient chain in size to stand that load, because I was very busily engaged up there trying to take all signals and watch from my end of it, you see, and I couldn't be on the ground and down there too, and in fact he didn't tell me what kind of a hitch he was going to make; that is not in my line; after he gets his hitches made, he tells me to go ahead."

Mr. Reese, a member of the wrecking crew, testified as follows in regard to the number and kind of chains they had on the wrecker:

"We had chains that were used in chaining up trucks to the body of the car. They ran from about three-fourths of an inch—little fellows, just long enough to keep from having so much chain around the job. Those were thrown out because we needed them, not on this car, but we needed them on other cars; and then we would throw out our cables we use on our car beams, we called it, and any kind of a thing that we would be liable to want. * * * I can say from my own knowledge we had chains there larger than seven-eighths inch; they were 1⅛ inch. I could not say what length they were. They wasn't for coupling up trucks, I know that. We had one chain 1¼. We used it for a car, you know, with a big link in each end of it, not a hook on it at all. I know that was 1¼ inches. We use that in chaining cars together. You see, you take out the knuckle of two cars and put a big link behind the knuckle head, and take both knuckles out and just use the chain. We had not used that chain on this; we had used it previous to this. I had used it. I don't know if that chain was in use at the time this accident occurred. No; it wasn't in use; I know it wasn't because we didn't have place to use it. The chains and cables were all in good condition that we were using. By good condition I mean a chain or cable that hasn't any defect that a man can detect with the naked eye. I never paid any attention to this business of examination; what was O. K.'d to me at the point I was working, or employés of the wrecking crew, is what we used. We did not select our own chains. We used what we was told to use. Mr. Roberg was the one that selected the tools and told us what to use."

One of the experts, witness for plaintiff, testified:

"It might be safe in a degree to use a chain to sustain stresses in excess of its proof strain, but, when the safe working load is exceeded, the danger point is being approached. There are instruments by which the maximum tensile stress of a hoisting chain may be determined. It is very simple in its application. It is practicable, judging from my own experience, to have hoisting chains tested periodically in order to determine their ultimate tensile stress. As to whether there is any particular variance between seven-eighths inch railroad wrecker chains, the proof test is constant, and is that which has been applied to the chain before it leaves the factory. There is no variation in the proof test; there is no minimum proof test; in other words, the maximum proof test is the only test applied. The maximum breaking test may vary from 41,360, as stated, to about anywhere between 46,000 and 47,000 pounds, depending upon the care the workman had exercised in making the chain. Chains which do not stand a breaking strain of 41,360 pounds would be rejected in that quality; so that 41,360 would be the minimum breaking test. The maximum safe working load should not exceed 13,300 pounds stated. It is safe under the 13,000 pounds minimum safe working load."

[1] We agree with the trial court that this evidence is insufficient to raise the issue of negligence on the part of defendant in failing to furnish the deceased, Roberg, with sufficient and safe appliances with which to perform the work in which he was engaged at the time he was killed. The chain the breaking of which caused the accident was unquestionably of insufficient strength for the purpose for which it was being used, but the undisputed evidence shows that it was not intended to be used in lifting heavy loads like the loaded car, and that Roberg was furnished with other chains amply sufficient for lifting the load in question, and that it was his duty to see that the proper chain was used. There is nothing in the evidence which indicates that the chain which broke was defective in any way, or was not in perfect condition and entirely sufficient for the purpose for which it was furnished the wrecking crew by the defendant; on the contrary, the evidence shows that it sustained the weight of the end of the car which was lifted and placed on the trucks, and this weight was greater than the maximum weight which a chain of that size was tested to sustain when it was manufactured. An experienced railroad man, such as Roberg was, should have known that this chain was too small to sustain the weight he was attempting to lift with it. Certainly the defendant could not have anticipated, when it furnished this chain for lifting light loads and furnished other stronger chains for lifting heavy loads, that its foreman, an experienced railroad man, in charge of the wrecking crew, and whose duty it was to select a chain of sufficient strength for lifting the load, would use a small insufficient chain not furnished by defendant for lifting such load, and no negligence can be imputed to defendant in supplying the wrecker with the small chain, a necessary and safe appliance for the use for which it was furnished.

[2] It is the duty of the master to furnish tools and appliances that are reasonably safe for any use that the servant may make of them in performing his work which the master could reasonably foresee or anticipate. This is the full duty of the master in this regard. If the servant makes an unusual or unnecessary use of the tools and appliances furnished by the master, which the master could not have reasonably foreseen, and by reason of an extraordinary strain being thus placed upon the appliances they give way and thereby cause injury to the servant, the master is not liable for such injury.

In 26 Cyc. p. 1247, the rule is stated that:

"It is the duty of a servant to use the appliances furnished him by the master for the prosecution of his work, and where proper appliances have been furnished him, and he is injured by reason of his failure to use them,

he cannot recover, if he knows or is charged with knowledge of the fact they have been furnished."

Thompson on Negligence, vol. 4, § 4003, states the rule as follows:

"A master is not liable for injuries to a servant resulting from a selection from an adequate stock of suitable appliances of an appliance which was unsuitable for the purpose for which he intended to use it, if such unsuitableness was the result of a defect which could not have been detected and provided against on the part of the master, or of its being too light for the use for which it was intended."

[3] It seems to us that this rule is obviously sound and consonant with right and justice. The courts of this state have uniformly recognized this rule. Railway Co. v. Hauer, 33 S. W. 1010; Throckmorton v. Railway Co., 14 Tex. Civ. App. 222, 39 S. W. 174; Horton & Horton v. Hartley, 170 S. W. 1046.

The doctrine is illustrated and applied in the cases of Toohey v. Equitable Gas Co., 179 Pa. 437, 36 Atl. 314; Prescott v. Ball Engine Co., 176 Pa. 459, 35 Atl. 224, 53 Am. St. Rep. 683; Amburg v. International Paper Co., 97 Me. 327, 54 Atl. 765; Fewell v. Southern Ry. Co., 105 Va. 1, 52 S. E. 689.

We think it clear that the evidence is insufficient to raise the issue of negligence on the part of the defendant in any of the other matters alleged in the petition.

The appliances furnished Roberg were entirely sufficient for raising the loaded car if he had used one of the larger and stronger chains or cables with which the wrecker was supplied, and therefore no negligence on the part of the defendant can be predicated on the fact that he was directed to raise the car without first unloading it.

[4] The evidence shows that there had been no inspection of the chain in question by the defendant, but this failure of inspection could not have been the proximate cause of the accident, for the obvious reason that the undisputed evidence shows that the chain was not furnished Roberg for lifting a heavy load, and defendant could not have anticipated he would so use it. If a test or inspection had shown the chain to have been in perfect condition, as all of the evidence indicates it was, it would still have been insufficient to sustain the weight of this load. If the chain had broken while being used for the purpose for which it was intended and supplied, it might be inferred that it broke because of some latent defect which a proper inspection would have revealed and defendant might have been held negligent in failing to make a proper inspection. This was the holding in the case of Jernigan v. Houston Ice & Brewing Co., 33 Tex. Civ. App. 501, 77 S. W. 260, cited by defendant. We think the facts of that case easily distinguish it from this case.

We have considered all of the assignments of error presented in the brief of plaintiff in error, and in our opinion none of them can be sustained. It follows that the judgment of the court below should be affirmed, and it has been so ordered.

Affirmed.

## On Motion for Rehearing.

In answer to a very forceful motion for rehearing presented by appellant, we desire to correct, or rather more accurately state, the conclusions of fact on which our former opinion in this case was based.

We say in that opinion that "the undisputed evidence shows that it (the chain the breaking of which caused the death of deceased) was not intended to be used in lifting heavy loads like the loaded car," and that it was entirely sufficient for the purpose for which it was furnished the wrecking crew by the defendant, and that "the defendant could not have anticipated, when it furnished this chain for lifting light loads and furnished other stronger chains for lifting heavy loads," that the deceased would have selected for use in lifting this heavy car the small chain not furnished for such purpose.

Counsel for appellant very earnestly insist that our conclusion that the chain in question was not intended to be used for lifting heavy loads like the one being hoisted at the time the chain broke and was not furnished by the railroad company for such purpose is not shown by the undisputed evidence. In support of this insistence the motion for rehearing sets out the following testimony of the witness Reese, who was one of defendant's witnesses:

"I did not hear anybody present complain about the size of the chain being used. That was H. & T. C. chain that came out of the wrecker. It was just an ordinary switch chain, seven-eighths inch chain. It is the kind of a chain we use in tying up a car when we go to make a lift. During the two months I had been there that chain or similar chains had been used. We had lifted several cars in the three days we had been there. By 'several' I mean there was seven or eight or ten; there was about seven or eight, I believe. Before that we had lifted box cars and stock cars and different classes of cars. I don't know how long the H. & T. C. had had this particular chain we were using. I hadn't noticed any label on the chain showing what weight it would carry. The chain looked good to me. I did not have any reason to question the fact it would raise that load. I did not hear anybody question the fact. I did not hear either one of the assistant superintendents say anything about it when we lifted the other end. Seven-eighths inch chain, wrecker chain, is the usual and ordinary wrecker chain used; that is what might be termed a standard in railway wrecker chains."

This testimony, and in fact all of the testimony, shows that this chain was furnished

for use by the wrecker crew in lifting cars, but utterly fails to show that it was furnished for use in lifting a loaded car of the weight of the car deceased was using it to hoist. All of the evidence shows that the car deceased was engaged in lifting from the track was much heavier than the usual car handled by the wrecking crew, and further shows that larger, stronger chains of ample strength to lift the car were furnished by the railroad company. The chain used was standard wrecking chain and the usual and ordinary wrecking chain. Appellee was certainly not negligent in supplying the wrecker with this chain, which was a proper instrument for the wrecking crew to use in hoisting cars and other wreckage. If it had only supplied this small chain, which was of insufficient strength to lift the heavily loaded car deceased was called upon to hoist, it would have failed in its duty to furnish deceased with safe and proper appliances with which to perform his work. But when it furnished a safe and sufficient chain it fulfilled its duty in this regard, and should not be held liable for the failure of deceased, whose duty is was to select a proper chain for the performance of the work, to make a proper selection.

As stated in our former opinion, the failure of the railroad company to have the chain inspected and tested could not possibly have caused or contributed to the death of the deceased. All the evidence shows that the chain was not defective in material or in any other respect. The testimony of the expert witnesses for appellant shows that a chain of this size cannot be made of sufficient strength to lift a load as heavy as the one deceased attempted to lift with it. If it had been tested by one of the testing machines spoken of by these witnesses, such test would have only been made to determine whether it would bear the weight it was designed to carry, and the undisputed evidence shows that it did carry this weight without breaking or disclosing any defect when it was used to lift the end of the car which was first raised.

[5] It is true that the evidence shows that the lifting capacity of a seven-eighths inch chain of this kind is a matter of expert scientific knowledge and could have been ascertained by the railroad company and the chain marked so that any one using it would be informed of the maximum weight it could lift or carry with safety. If the failure to so mark the chain could be held to be negligence on the part of the railroad company, such negligence was not alleged in the petition, and therefore appellant could not recover on this ground.

After a careful consideration of the motion for rehearing, we feel constrained to adhere to the conclusions expressed in our former opinion, and to refuse the motion.

## On Second Motion for Rehearing.

In an earnest desire to correctly determine the issues presented by this appeal, we have given full consideration to a second motion for rehearing filed by appellant. We find nothing in the motion to shake our conclusion that the judgment of the court below should be affirmed for the reasons stated in our original opinion, and we do not deem it necessary to add anything to what we have before said in discussing the questions raised by that appeal. We desire, however, to answer some of the criticisms made in the second motion for rehearing upon the findings of fact in our original opinion and our opinion upon the first motion for rehearing.

The first complaint in this motion is that our finding that "all the evidence shows that the car deceased was engaged in lifting from the track was much heavier than the usual car handled by the crew" is not sustained by the record because the witness Shipp testified:

"This car loaded with cinders was a medium load; you wouldn't exactly call it a medium load, either; a medium load runs about 85,000 pounds. I wouldn't call this an extremely heavy load, because the oil tanks are an extremely heavy load, 145,000 pounds; and as well as I remember a car of cinders, these cars, with these iron sides, weigh about 110,000 to 125,000 pounds."

This is a sample of the fairness of the criticism contained in the motion. The witness Shipp, in the quotation from his testimony, was speaking of the weight of the loaded car. This is manifest from the language of the quotation and the context of his testimony. The weight of the car unloaded was 44,000 pounds. It was a steel car, and weighed more than the average car. Wrecked cars were not generally lifted with the load in or on them. One of the grounds of negligence alleged and relied on by the appellant was the order of the superintendent directing that this car should be lifted before it was unloaded.

The third assignment of error presented in appellant's brief is as follows:

"The court erred in peremptorily instructing the jury to return a verdict for the defendant, because the issue was raised in the pleadings and in the evidence as to the negligence of the defendant through its vice principal, in requiring Andrew Roberg to hoist the car upon which he was working, while loaded with cinders, instead of permitting him to unload the car before hoisting the same, and that such negligence was the proximate cause of the death of Andrew Roberg."

Such being the record, we hardly think counsel upon reflection will contend that our finding that all the evidence shows that this car was much heavier than the usual car handled by the crew is not supported by the record.

There is nothing in the former opinion of this court from which it can be implied that the court was of opinion that the railroad company was negligent in not testing the strength of this chain, or furnishing a machine by which it could have been tested. On the contrary, we expressly held that no negligence was shown in this respect, and this holding was based, not, as stated in appellant's motion, on the ground that the pleading does not allege such ground of negligence, but on the finding that the undisputed evidence shows that no proper or reasonable test of the chain would have shown any defect; the undisputed evidence being that it was in perfect condition and capable of sustaining all the weight it was designed to carry.

It would serve no useful purpose to further answer the contentions made in the motion. In our endeavor to fully find all of the facts upon which appellant's claim is based we have probably given consideration to immaterial matters.

The controlling facts in this case, upon which an affirmance of the judgment is based, and which are shown by the undisputed evidence, are: That a sufficient chain was furnished the deceased with which to raise the car, and that it was the duty of the deceased to select the proper chain from the adequate stock furnished him by the appellee. Upon these facts the master cannot be held liable for the failure of the deceased to select the proper and suitable chain with which to perform the work.

We think the motion for rehearing should be refused, and it has been so ordered.

Refused.